## CONTRACT FOR THE EXCLUSIVE SALE OF A PATENTED ARTICLE.

[Circuit Court of ·Lucas County.]

THOMAS VAN TUYL v. HOMER J. YOUNG ET AL.*

Decided, October 19, 1901.

*Damages—Provision for a Liquidated Sum—Not as Penalty but as Compensation Will be Enforced—Contract for Payment of Royalties—Measure of Damages for Failure to Carry Out—Such Failure Does Not Work a Rescission.*

1. Where the measure of damages is provided for in the contract, and the damages are liquidated, and the sum to be paid is not in the nature of a penalty, but in the nature of a compensation agreed upon between the parties, it is the policy of the courts to uphold and enforce the agreement in that behalf.

2. The failure of one of the parties to a contract to perform his part does not operate *ipso facto* to work a cancellation. It may give to the party not in default a right to rescind, but that option is not a privilege of the one defaulting; and where the contract contains no condition upon which there shall be a forfeiture, but simply a provision for cancellation, some positive fact amounting to an absolute rescission and tender of the amount due, is necessary to terminate the contract.

3. Under the contract in suit, granting the exclusive right to make and sell handle bars for bicycles, the measure of damages for its breach is the royalty upon the minimum production provided for in the contract, notwithstanding no handle bars were made or sold.

*Affirmed by the Supreme Court without report, March 8, 1904.

PARKER, J.; HAYNES, J., and HULL, J., concur.

In the court below the parties stood as they do here, Van Tuyl being plaintiff and Young and another being defendants. The action was brought upon a written contract and bond. The contract is not very long, and I will read it:

"This contract made and entered into this 16th day of September, 1898, by and between Thomas Van Tuyl, of Nicholas, Iowa, party of the first part, and H. J. Young, of Toledo, Ohio, party of the second part, witnesseth:

"That whereas the said H. J. Young is about to conduct an enterprise for the manufacture and sale of a certain patented bicycle handle bar, which patent was issued to the said Thomas Van Tuyl under date of May 10, 1898, and under the title of the "Van Tuyl Double Adjustable Bicycle Handle Bar," whereby the said Thomas Van Tuyl (patentee) is to receive as such patentee a royalty on each and every Van Tuyl adjustable bicycle handel bar so manufactured and sold by H. J. Young, his successor or assigns, as hereinafter set out.

"The said Thomas Van Tuyl hereby awards to said H. J. Young, his successor or assigns, the sole and exclusive right to manufacture and sell the aforesaid patented handle bar, protected by letters patent to said Thomas Van Tuyl from the U. S. Patent Office granted May 10, 1898, and numbered 603,671, and all patented improvements on the said handle bar which the said Van Tuyl may hereafter invent or acquire for and in consideration of a royalty for the manufacture and sale of said handle bar as herein set out.

"The said H. J. Young, his successors, legal representatives or assigns, agrees in consideration for the sole and exclusive right and privilege to so manufacture and vend the said handle bar as above set out and described, to pay or cause to be paid the said Thomas Van Tuyl, his legal representatives or assigns, a royalty of ten cents on each and every handle bar for the first 10,000 so manufactured and sold; and a royalty of five cents thereafter on each and every handle bar in excess of 20,000 so manufactured and sold by the said H. J. Young, his successors and assigns. Said royalty to be due and payable on the first day of each and every month for all handle bars manufactured and sold the previous month."

[It seems to us that the word "twenty" there is probably inserted through mistake; the word "ten" must have been intended. We could not otherwise reconcile the terms of the

contract. However, it is not very material to the question we have submitted to us].

"The said H. J. Young, for himself, successors or assigns, further agrees hereby to manufacture and sell not less than 10,000 of aforesaid handle bars on or before the 1st day of September, 1899, and to manufacture and sell not less than 10,000 each succeeding year thereafter, or so long as said H. J. Young shall continue to so manufacture and sell said handle bars after the 1st day of September, 1899, or surrender and cancel this contract.

"The said Young, his legal representatives or assigns, hereby further agree to manufacture the first 1,000 handle bars before the 1st day of February, 1899, or cancel this contract, and whether manufactured or not to be liable to said Van Tuyl, his legal representatives or assigns, for the royalty of ten cents each upon said 1,000 handle bars.

"Said H. J. Young for the faithful performance of the above and foregoing conditions to be by him kept and performed, hereby further agrees to execute and deliver to the said Thomas Van Tuyl his good and sufficient bond in the sum of $1,000, signed by at least one resident freehold security, and approved by said Thomas Van Tuyl, which bond shall be holden until the 1st day of September, 1899. That each year thereafter from the date last above mentioned the said H. J. Young shall execute and deliver a like bond in the sum of $500, so long as he or his successors shall manufacture and sell said handle bar.

"It is further agreed by the said H. J. Young that should he desire to continue to so manufacture and sell said handle bars after the said 1st day of September, 1899, he shall give notice to the said patentee at least thirty days prior to the 1st day of September, 1899, and a like notice each year thereafter, so long as the said H. J. Young shall continue in said manufacture and sale of said handle bars.

"It is further agreed by and between all parties hereto that the said Thomas Van Tuyl shall at all times have free and undisputed access to the books of said H. J. Young, his successor or assigns, for the sole and only purpose of ascertaining the number of said handle bars so manufactured and sold.

"It is further understood and agreed that this contract shall be binding and in effect from and after the 16th day of September, 1898, on which date said H. J. Young shall sign this contract and furnish to said Van Tuyl a bond (which bond is hereby made a part hereof in conformation with the above and foregoing conditions in the sum of $1,000 for the faithful performance of the same).

"This contract to be in duplicate and when properly signed and bond furnished, each party to have a copy of the contract and the same to be in full force and' effect thereafter.

"Signed in duplicate this 16th day of September, 1898. (Signed by the parties, and witnessed, and acknowledged before a notary public)."

And the bond reads:

"Know all men by these presents, that we, H. J. Young, as principal, and E. D. Hubbell, as surety, of the county of Lucas and state of Ohio, are held and firmly bound unto Thomas Van Tuyl in the penal sum of $1,000, for the payment of which and truly to be made we bind ourselves, our heirs, executors, administrators and assigns firmly by these presents.

"Sealed with our seal and dated this 16th day of September, 1898.

"The condition of the above obligation is such, that whereas, the above bound H. J. Young, of Toledo, Ohio, on the 16th day of September, 1898, entered into a contract with Thomas Van Tuyl, of Nicholas, Iowa, for the sole and exclusive right to manufacture and sell a certain patent handle bar known as the Van Tuyl Double Adjustable Bicycle Handle Bar, and protected by letters patent number 603,671 of the patent office of the U. S., and paying the said Van Tuyl a royalty on each and every handle bar manufactured and sold under said patent a certain specified royalty.

"Now, therefore, if the said H. J. Young shall do and perform all the stipulations and conditions of said contract to be by him kept and performed, then this obligation shall be null and void; otherwise to be and remain in full force and effect in law.

"Witness our hands and seals this 16th day of September, 1898." It is duly executed.

In the court of common pleas the plaintiff recovered a judgment for $100, with interest from February 1, 1899. The prayer of the petition was for judgment for $1,000 and interest.

The plaintiff contended that the measure of damages for the default alleged was fixed by the contract at ten cents each upon 10,000 handle bars that should have been manufactured during the year, and that the damages, therefore, to which he was entitled amounted to $1,000. He filed a motion for a new trial upon the ground that the verdict was against the law and the evidence, i. e., that the award of damages was too small.

It appears from the bill of exceptions that the defendant, Young, did not enter upon the manufacture of these handle bars at all. He never manufactured any of them. Sometime in the fall of 1898 he began to correspond with the plaintiff with a view of effecting a rescission of the contract, but the terms of his proposal were not accepted by the plaintiff.

It is set forth in the bill of exceptions that—

"It is admitted by the plaintiff and the defendants that no handle bars were manufactured or sold by the defendants, Homer J. Young or Edward P. Hubbell, in pursuance of the contract hereto attached, marked plaintiff's exhibits Nos. 1 and 2, and that no royalty was paid by the defendants to the plaintiff."

There was no averment or evidence that the plaintiff had manufactured or sold any handle bars, or that anyone else for him had done so during the year. The plaintiff did not introduce any evidence of any damages that he had suffered by reason of the failure of the defendants to manufacture and vend the handle bar, relying upon the terms of the contract as providing not only the measure of damages, but as liquidating the damages, stating the amonut definitely; that is to say the minimum amount that he would be entitled to recover.

A jury was waived in the court below, and the case was submitted to the judge, and it is evident from the amount of his award of damages that he did not sustain the contention of the plaintiff in error, but that he regarded the provision in the contract that "The said Young, his legal representatives or assigns, hereby further agrees to manufacture the first 1,000 handle bars before February 1, 1899, or cancel this contract, and whether manufactured or not, to be liable to said Van Tuyl, his legal representative or assigns, for the royalty of ten cents each upon said 1,000 handle bars," as being the only provision which fixed the measure of damages in the event that the handle bars were not manufactured and sold, and as being the only provision for liquidated damages.

The question presented, it will be observed, turns entirely upon the construction to be placed upon this contract. We are

unable to agree with the conclusions of the learned judge of the court below. We are of the opinion, looking at the whole contract, and reading it in the light of the purposes to be served by it, that the proper construction to be put upon it is, that if Young held on to the privileges thereby conferred upon him beyond February 1, 1899, that is to say, if he did not cancel and surrender the contract before that time. he would be bound to manufacture and sell and pay royalty upon 10,000 handle bars, or if he did not manufacture and sell them, nevertheless to pay a royalty for the year upon the 10,000 handle bars that he agreed to manufacture and sell during the year. If he manufactured and sold 10,000 handle bars, he would be required to pay the royalty of ten cents each thereon; if he manufactured and sold more than 10,000, he would be required to pay a royalty of ten cents each upon the 10,000, and a royalty of five cents each upon any in excess of 10,000, assuming that the word "twenty" to which I referred was inserted by mistake, and that it should read "ten." We believe this is the true construction of the provision on the subject of royalties, in the light of other provisions of the contract, especially in the light of the provisions respecting the bond required.

It is apparent that if a distinct measure of damages had not been provided in the event of a failure to perform, by the manufacture and sale of the handle bars, it would be difficult, if not impossible, to arrive at a true and just measure of damages. It is also apparent that it would be important to the patentee, who conferred this exclusive right upon the manufacturer, that the handle bars should not only be manufactured and put upon the market, but that such number should be manufactured and put upon the market as would bring to him some reasonable return, in consideration of his having surrendered to the manufacturer the exclusive right to manufacture and vend for the period stated. It is apparent, too, from the correspondence itself, that it would not have been feasible for the patentee to accept a surrender of this contract after the first day of February of any year, and then undertake to enter into a new arrangement, either for the manufacture and vend

ing of the article himself, or with another manufacturer to do so, because the season after that would be so far advanced that it would be impracticable to place the handle bars upon the market during the season. And it seems to us, looking over the whole contract, that this contingency is provided for in the clause which I have just read. That seems to us to be a definite provision that the right of cancellation which is given to the manufacturer is limited, for the initial year, at least, to February 1, 1899. And we think that it should be and is the policy of the courts, where the measure of damages is provided for in the contract, where the damages are liquidated, where the sum to be paid is not in the nature of a penalty, but in the nature of a compensation agreed upon between the parties to uphold and enforce provisions of that character.

In the clause immediately preceding that which I have just read the matter of surrender and cancellation is mentioned, but in our judgment the cancellation there provided for has reference to other provisions of the contract for years subsequent to September 1, 1899; that is to say, if the defendant should not desire to manufacture during any succeeding year, and failed to renew the contract by giving the notice and bond provided for other years, that then he should surrender and cancel the contract. This does not say that the failure to give such notice and bond would necessarily operate as a cancellation of the contract. The contract, by its terms, is adequate for future years. It provides for other years succeeding September, 1899. And the patentee, Mr. Van Tuyl, might have waived the notice provided for in the contract, and might even have waived the bond provided for in the contract, and if the defendant had gone ahead and manufactured, VanTuyl would have had a right, notwithstanding the failure to give notice and bond, to consider and hold him as manufacturing under and in pursuance of this contract, and to require him to pay the royalty provided for by the contract. It would not be within the power of the defendant to effect a cancellation or abrogation of this contract simply by failing to perform certain conditions of the contract imposed upon him.

It was contended in argument that since Young had failed to manufacture any handle bars, he had forfeited his rights under the contract; that the contract had *ipso facto* become inoperative; that it had been annulled with respect to all its provisions, excepting those as to the manufacture of 1,000 handle bars up to February 1, 1899. A right of cancellation was given to Mr. Young, but cancellation requires some positive act. A failure to perform the contract on the part of Young would not *ipso facto* operate to work cancellation. It might give to the patentee, Mr. Van Tuyl, not in default, a right to rescind and annul the contract; but that option would be in Mr. Van Tuyl, and not in the party in default. In this respect the principle of forfeiture is similar and applicable; and upon that head I read from a case that was cited in argument—*Woodland Oil Co.* v. *Crawford*, 55 Ohio St., 161. I read from the opinion by Judge Burket:

"This case arose upon an oil lease which contained a provision that—
" 'A failure on the part of U to complete such well or wells as above specified, or instead thereof to pay the rental as above provided, shall render this lease and agreement null and void, together with all rights and claims, and not binding on either party, and not to be revived without the consent of both parties hereto in writing.' "

The lessee having failed to perform, either by the driving of the well or by paying rental, when he was called upon to respond in damages, answered that by the terms of the lease his failure to perform had abrogated the agreement. Judge Burket very tersely and emphatically disapproves of that proposition: I read from pages 176 and 177:

"The principal contention in this case arises upon that part of the lease which provides that a test well should be drilled within one year, and in default, payment of a yearly rental of $128 for further delay, and a further provision that a failure to drill the test well, or pay the rental, should render the lease null and void, and not binding on either party, and not to be revived without the consent, in writing, of both parties.

"It was this provision that was relied upon in the demurrer to the amended petition, and in the third general defense in the answer of the oil company.

"Reduced to its essence, this is a promise to in writing, upon sufficient consideration, to pay a yearly rental of $128 for the right to use, to a limited extent, certain premises, with a further provision in the same instrument, that a failure to pay should discharge the debt; that a default of payment should be the equivalent of payment; that failure should be performance; that non-payment should be payment.

"Such contradictions in like instruments have caused the courts to look critically into such instruments to ascertain the real intention of the parties, because such contracts can not be enforced according to their letter. A promise to pay can not be fulfilled by a failure to pay. A promise to drill a well can not be satisfied by a failure to drill such well. The proper construction to be placed upon such an agreement is, that upon failure of the lessee to drill a well, or pay the rental, or both, as the case may be, the lessor may elect to put an end to the lease, and enforce payment of the promised rental, or sue for damages for failure to drill the well, or he may elect to have the lease continue in force to the end of the term, and enforce the drilling of wells and the payment of rentals, as provided in the lease. Such provisions of forfeiture are for the benefit of the lessor, and not for the benefit of the lessee. The lessee can not plead his own default or wrong in discharge of his obligation to drill or pay rental."

The contract under consideration here has no such express provision, and, besides, it contains no condition upon which there shall be a forfeiture, but simply a provision for a cancellation, which, as I have said, requires a positive act—something more than a mere failure to perform; and we think the principles enunciated in the case from which I have just read apply with full force to the case under consideration and to the argument advanced in support of the proposition that the failure to perform operated to cancel the agreement.

It is contended on behalf of the defendant in error that Young did exercise his right to cancel the agreement. It will be observed that it is very clearly and distinctly provided in the agreement that Young shall be liable for at least $100, whether he manufactures any handle bars or not. About that

counsel make no question.  As I have said, we hold that the
provision as to cancellation was limited to February 1, 1899.
There was some correspondence· upon the subject of putting
an end to this agreement, and it is upon that correspondence
that the defendant in error relies to show that the cancellation
was effected.  I need not read all of it.  The first letter refer-
ring to the matter of putting an end to the contract is dated
November 29, 1898.  It reads:

"MR. THOS. VAN TUYL,
    "Nicholas, Iowa.

*"Dear Sir:*  I write you to-day in regard to your double ad-
justable handle bar which has been absorbing my attention
more or less for the past month, and at this time can not see my
way clear to do you justice upon your bar for the coming season.
Our Mr. Hubbell and myself had about concluded a deal
whereby one of the largest jobbing houses in the bicycle sundry
and fittings line would dispose of the output for us, but the
deal, up to this time, has not been consummated, and they
report to us that they have got more than they can do this
season upon their· regular line.  We are also in a similar con-
dition ourselves with our own business here, and it is taking
so much of our time and attention that it is impossible for us
to do your handle bar justice.  I therefore wish to state if you
will kindly release me and Mr. Hubbell as my surety, in regard
to contract entered into, I will surrender and deliver contract
to you.  I believe that this will certainly be to your advantage,
because it will be necessary to do considerable preliminary work
even for the coming year, and it will now enable you to prepare
yourself in plenty of time for the retail trade for next season;
and introducing a bar of this kind, it will be almost impossible
to force it onto the manufacturer or jobber before you have done
your preliminary work with the retailer.  I therefore verily
believe that you should take hold of it and put it on the market
this season.

"I have regretted very much my inability to give it proper
attention and was in hopes to tie up with some concern who
would handle the output for this season and give it a name
in the trade.

"Enclosed please find release of contract, which I would ask
you to kindly sign and return, and will forward to you tools and
bars now in our possession.  I believe you will consider this
the best thing to be done in the premises, and let the contract

revert back to you. Therefore, if you will kindly send in your release, we will act very promptly.''

And in connection with that appears a release, which we understand is a copy of the one which went forward with the letter (though it contains the date of December 6, 1898), which reads:

''Mr. H. J. Young,
  ''Toledo, Ohio.
  ''*Dear Sir:* In consideration of your surrendering contract between us dated September 16, 1898, to me, for the control of U. S. letters patent No. 603,671, I hereby release you and your surety from all obligations thereunder.
                              ''Very truly yours.''

That was to have been signed and returned by Mr. Van Tuyl. The answer that Mr. Van Tuyl made does not appear in the record, but it is apparent from other letters by Mr. Young and Mr. Hubbell that he did not accept this proposition. There is more correspondence along that line—more letters—before February 1, 1899, in which this proposition to rescind is repeated. Then on June 2, which was after the time, according to our construction of the contract, within which Mr. Young might have cancelled this contract and surrendered it, he writes as follows:

''Mr. Thos. Van Tuyl,
  ''Nicholas, Iowa.
  ''*Dear Sir:* Please take notice that on November 29, 1898, I did by letter cancel and surrender all my right, title and interest that I had or might have acquired in and to a certain contract, dated the 16th day of September, 1898, between you (Thomas Van Tuyl, Nicholas, Iowa) and myself (H. J. Young, of Toledo, Ohio), in regard to a patented adjustable handle bar; and I hereby again notify you that I do relinquish all my right, title and interest in and to above contract, and I hereby surrender my original copy of said contract, and send the same by mail to you to-day.
                              ''Very truly yours,
                                        H. J. Young.''

And accompanying that was his copy of the contract with the words ''Canceled November 29, 1898,'' written upon it. When

that was written upon it does not appear, but according to our construction of these letters and these acts, the statement that he had, upon November 28, 1898, canceled the contract and surrendered his rights under it, was incorrect. He had simply proposed a rescission upon the terms that his obligation to pay $100 should be canceled and released—a proposition that Mr. Van Tuyl was not required to accept, and that he steadfastly refused to accept. We do not think that it would have been necessary for Mr. Young to have paid $100 as a condition precedent to exercising his right to cancel; but he might have canceled absolutely, if he had done so before February 1, 1899, and then Mr. Van Tuyl would have been compelled to enforce as best he could the obligation of Mr. Young and his bondsmen to pay $100. But Mr. Young did not attempt to exercise that right. He was seeking to save the $100 and to obtain a rescission of the contract by agreement with Mr. Van Tuyl. The situation was this: Up to the second of June Mr. Van Tuyl had declined to accept this proposition to rescind the contract and put an end to the rights conferred upon Mr. Young under this contract—the exclusive right to manufacture and vend was still in Mr. Young. Mr. Van Tuyl had no right, upon the mere submission of this proposition, or unless he accepted it and released Mr. Young from the obligations under the contract to manufacture and vend handle bars, or to confer the right upon another. The exclusive right to make and vend the handle bars was in Mr. Young, and remained in him. Mr. Young said that he would relinquish it; that he would surrender the contract if the obligation to pay $100 were surrendered, and that proposal Mr. Van Tuyl declined. So that we are of the opinion that Mr. Young did not accomplish a cancellation; indeed, did not attempt to exercise the right to cancel the contract within the time that by its terms he might have done so.

Holding these views, and believing that the measure of damages applied by the court below was not correct, and that the motion for a new trial should have been granted upon the ground that the award was too small, the judgment of the

court of common pleas will be reversed, and the cause remanded.

*C. E. Longwell*, for plaintiff in error.

*B. F. Brough, Doyle & Lewis* and *C. A. Seiders*, for defendant in error